IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AMBER CANTER, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO. JKB-19-2395 |
| STATE OF MARYLAND, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Amber Canter filed a Motion for Default Judgment, which the Court has already granted. (*See* ECF Nos. 130, 131.) Plaintiff has now provided additional briefing with respect to the damages she seeks. (ECF No. 141.) The Court will enter judgment in favor of Plaintiff against Defendant Zanel Santana in the amount of $200,000.

### I. Factual and Procedural History

The Court provides a brief summary of the factual and procedural background of this case, which is more fully laid out in the Court's Memorandum dated February 27, 2025. (*See* ECF No. 130.) Plaintiff alleged that Defendant Santana, a Correctional Officer at the Baltimore City Central Booking and Intake Center, assaulted her while she was detained there. After Plaintiff complained that she had not received certain recreational time:

> "Santana arrived on scene and stood behind [Plaintiff] and shouted to Defendant Washington, 'Mace this fucking dick sucker!'" ([ECF No. 72] ¶ 31.) Santana "then put on his tactical gloves and acted as if he was going to strike [Plaintiff]" and "began pushing [Plaintiff] in her back with his knee as she sat on the floor." (*Id.* ¶ 32.) Santana then placed Plaintiff in a chokehold while she was still seated on the floor. (*Id.* ¶ 36.) He "simultaneously took his left arm and clamped his right arm even more tightly around [Plaintiff's] neck, and he placed his left hand on the back of [her] head for additional leverage and torque, in an attempt to cause [her] as much pain as possible." (*Id.*) Plaintiff alleges that the chokehold "was and

> continues to be expressly forbidden according to DPSCS use of force training directives." (*Id.* ¶ 37.) Santana "lifted [Plaintiff] off the ground while continuing to unlawfully choke her, and he began to push/carry her out of the sally port and into a common area." (*Id.* ¶ 38.) Santana "choked [Plaintiff] so violently that she could not breathe and she was rendered unconscious within a matter of seconds." (*Id.* ¶ 40.) However, Santana "did not care" and "continued to choke [her] tightly around her neck while carrying her limp body across the common room floor by her neck for several more feet." (*Id.* ¶ 41.) Then, "without any lawful or justifiable purpose, Defendant Santana intentionally dropped [Plaintiff's] lifeless body" and her "head fell from Defendant Santana's waist-level down to the concrete floor directly onto her face." (*Id.* ¶ 44.) The Third Amended Complaint includes screenshots reflecting these events, taken from security footage. (*See generally id.*)
>
> No officers sought medical treatment for Plaintiff for more than ten minutes following these events, despite the fact that Plaintiff had been rendered unconscious and that she "had sustained a serious open head wound that was visibly bruised and swollen." (*Id.* ¶ 46.) She was later transported to the medical unit for treatment and, due to the seriousness of the injuries, she was transferred to the Intensive Care Unit at Johns Hopkins Hospital. (*Id.* ¶¶ 48, 49.) There, she was "diagnosed with a fractured left orbital bone, a fracture to her left optic nerve canal, fractures to her left anterior skull base, multiple sinus fractures, severe bruising to her left forehead, pneumocephalus (air pockets in the intracranial space created by blunt force trauma), and internal bleeding behind her left eye." (*Id.* ¶ 50.) Despite directives from Johns Hopkins for follow up medical appointments, "the staff refused to allow [Plaintiff] to attend all her medical appointments in retaliation for her complaints of being assaulted." (*Id.* ¶ 53.)

(ECF No. 130 at 2–3.) Plaintiff alleged that Defendant Santana conspired with other officers to falsify use-of-force reports to cover up the unlawful conduct. (*Id.* at 3.) Ultimately, he was charged with felony First Degree Assault, and two counts of Misconduct in Office, and was found guilty of Second Degree Assault and two counts of Misconduct in Office. (*Id.* at 4.)

Plaintiff filed, and the Court granted, a Motion for Default Judgment. (*See generally id.*) In particular, the Court granted the Motion as to the following counts: a 42 U.S.C. § 1983 claim premised on a violation of Plaintiff's Fourteenth Amendment rights based upon excessive force (Count 1); violation of Articles 24 of the Maryland Declaration of Rights (Count 4); gross negligence (Count 6); and intentional infliction of emotional distress (Count 9). (*Id.*)

2

In its Memorandum granting the Motion, however, the Court concluded that Plaintiff had not provided sufficient evidence or citation to authority with respect to her compensatory and punitive damages requests, and directed her to provide additional briefing. (*Id.*) She has now done so. (ECF No. 141.) The Court discusses her damages in more detail below.

## II.   Legal Standard

After entry of default under Federal Rule of Civil Procedure 55(a), a party may move for default judgment. Entry of default against a defendant does not alone entitle a plaintiff to judgment as of right:

> "The defendant, by [its] default, admits the plaintiff's well-pleaded allegations of fact . . . [but] is not held . . . to admit conclusions of law. In short, . . . a default is not treated as an absolute confession by the defendant of [its] liability and of the plaintiff's right to recover." The court must . . . determine whether the [conceded facts] support the relief sought in [the] action.

*Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). "In the Fourth Circuit, district courts analyzing default judgments have applied the standards articulated by the United States Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to determine whether allegations within the complaint are 'well-pleaded.'" *Vasquez-Padilla v. Medco Props., LLC*, Civ. No. PX-16-3740, 2017 WL 4747063, at *2 (D. Md. Oct. 20, 2017) (collecting cases).

While a plaintiff's factual allegations are deemed admitted, allegations relating to the amount of damages are not deemed admitted based on a defendant's failure to respond to a suit. *Meade Communities, LLC v. Whitaker*, Civ. No. ELH-22-2381, 2023 WL 2914787, at *2 (D. Md. Apr. 11, 2023). Instead:

> the Court must make an independent determination regarding allegations as to damages. In so doing, the court may conduct an evidentiary hearing. However, the

3

court may also make a determination of damages without a hearing, so long as there
is an adequate evidentiary basis in the record to support an award of the requested
damages.

*Id.* at *3. Further, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54.

## III. Analysis

Plaintiff seeks compensatory and punitive damages. For the reasons that follow, judgment will be entered in the amount of $200,000, comprised of $100,000 in compensatory damages and $100,000 in punitive damages.

### A. Compensatory Damages

Compensatory damages are available in actions brought under 42 U.S.C. § 1983. "[O]ut-of-pocket loss and other monetary harms and impairment of reputation, personal humiliation, and mental anguish and suffering [can] be awarded." *Price v. City of Charlotte*, 93 F.3d 1241, 1246 (4th Cir. 1996) (cleaned up) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986)). In considering damages for emotional distress, the Court assesses: "the factual context in which the emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; the degree of such mental distress; mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical attention resulting from the emotional duress; psychiatric or psychological treatment; and the loss of income, if any." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007).

Plaintiff seeks $500,000 in compensatory damages. Plaintiff explains that she endured and continues to endure physical, emotional, and psychological pain. (ECF No. 141 at 3.) Plaintiff has submitted an affidavit describing the events of June 14, 2019 and her resulting injuries. (ECF No. 141-1.) She explains that she remembers pain in her neck and having her windpipe forced closed, and passing out. (*Id.* at 1.) She explains that the "left side of [her] sinus was crushed" and

4

that she now "suffer[s] from chronic breathing difficulties, persistent nose and ear problems, and frequent, debilitating migraines" that will "likely require lifelong treatment." (*Id.* at 3.) She explains that she "continue[s] to suffer from Post-Traumatic Stress Disorder, anxiety, depression, and insomnia" and that she "relive[s] the incident through constant flashbacks and vivid nightmares." (*Id.*) She also explains that she struggles with suicidal ideation and that she has attempted suicide and self-harm five times since the assault. (*Id.* at 4.) The additional evidence submitted by Plaintiff—including medical records from Johns Hopkins (ECF No. 141-2) and from the prison (ECF No. 141-3), the DPSCS investigative report and surveillance footage (ECF Nos. 141-4, 141-5), photographs of her injuries (ECF Nos. 141-6, 141-7), and a report by a psychiatrist (ECF Nos 141-8, 141-9)—corroborates her affidavit and reflect that Plaintiff suffered severe physical trauma, and that she suffers from and will continue to suffer from emotional and psychological pain. For instance, the Johns Hopkins records reflect that Plaintiff sustained multiple facial fractures and severe swelling, and photos reflect the extreme nature of the injury. (*See, e.g.*, ECF Nos. 141-2 at 5, ECF No. 141-7.) The report from a psychiatrist reflects that Plaintiff sustained a traumatic brain injury, and that she has developed posttraumatic migraines, traumatic vestibulopathy, and posttraumatic stress disorder. (ECF No. 141-8 at 8.) He also opined that Plaintiff developed posttraumatic stress disorder and that her depression was exacerbated, given that she continues to have active symptoms of severe depression, including suicidal ideation. (*Id.*) He explained that he believes that she will require life-long treatment. (*Id.*) The evidence also reflects the brutality of Defendant's actions. (*See, e.g.*, ECF No. 141-4 at 5 (investigative report reflecting that Defendant placed Plaintiff in a headlock, Plaintiff was unconscious, and Defendant dropped Plaintiff onto the concrete floor, and then dragged her to her cell).)

The Court has reviewed the cases provided by Plaintiff, as well as awards in cases not cited by Plaintiff. The Court concludes that the damages cited by Plaintiff would be excessive here, given that they reflect jury awards between $250,000 and $900,000. (*See* ECF No. 141 at 10). But the Court also finds that the damages awarded in certain default judgment actions in this Circuit would under-compensate her for the harms she has suffered. *See, e.g., Sorto v. McDonald*, Civ. No. 15-CT-3131-D, 2018 WL 4404714, at *6 (E.D.N.C. Aug. 20, 2018) (awarding $25,000 in compensatory damages for physical injuries and emotional distress where a correctional officer used excessive force on multiple occasions, including pepper spraying, kicking, and hitting plaintiff, and smashing plaintiff's head against the concrete floor); *see also Williams v. Shultiz*, Civ. No. 14-CT-3091-BO, 2019 WL 6974337, at *2 (E.D.N.C. Dec. 18, 2019), *aff'd sub nom. Williams v. Jordan*, 824 F. App'x 184 (4th Cir. 2020) (awarding $10,000 where defendant correctional officers hit plaintiff with a baton several times, including when plaintiff was restrained); *Diggs v. Balogun*, Civ. No. TDC-15-0535, 2018 WL 3329585, at *4 (D. Md. July 6, 2018) (awarding plaintiff a total of $40,638 in compensatory damages, which included $20,000 in non-economic damages where plaintiff was assaulted by a correctional officer twice).

Upon consideration of the record in this case, the Court will award Plaintiff $100,000 in compensatory damages. The Court concludes that this amount is appropriate in consideration of Plaintiff's economic, physical, emotional, and psychological damages. In fashioning this award, the Court has taken into account the evidence cited above, which reflects that Plaintiff suffered a severe physical injury, and the lasting physical, emotional, and psychological harm that Defendant's actions cause.

### B. Punitive Damages

Plaintiff seeks $1,000,000 in punitive damages. Punitive damages are available "when the

defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Such damages are available "to punish the defendant for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Id.* at 54.

Defendant's conduct plainly demonstrated a "reckless or callous indifference" to Plaintiff's rights, and was "motivated by evil motive or intent." Defendant placed Plaintiff in a chokehold when she was not resisting, choked her until she was rendered unconscious, and then dropped her on the floor such that she fell from Defendant's waist height onto the concrete floor, sustaining numerous injuries. There are long-term consequences from those injuries—i.e., "permanency" in the vocabulary of disability law. (*See* ECF No. 141-1 at 3 (affidavit from Plaintiff explaining that the physical issues "affect [her] quality of life and, according to medical provides, will likely require lifelong treatment" and explaining that "[t]he emotional, physical, and psychological damage is profound and permanent"); ECF No. 141-8 at 8 (psychiatrist report opining that Plaintiff will require long-term treatment).) An award of punitive damages continues to be appropriate both to punish him and to deter others like him from any such conduct in the future.

The Court concludes that a punitive damages award of $100,000 is appropriate. The Court concludes that this adequately punishes the Defendant, and deters him and others like him from similar conduct. This one-to-one ratio between punitive and compensatory damages is appropriate, as "single digit ratios [between compensatory and punitive damages] generally do not present a constitutional issue." *Morris v. Bland*, 666 F. App'x 233, 241 (4th Cir. 2016).

### IV.   Conclusion

For the foregoing reasons, the Court will enter judgment in favor of Plaintiff and against Santana in the amount of $200,000.

7

DATED this 12 day of June, 2025.

BY THE COURT:

*/s/ James K. Bredar*

James K. Bredar
United States District Judge